IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DAVID COLEMAN                    :
            *Plaintiff*,
                                                    CIVIL ACTION
            v.                    :               NO. 1:15-1942

UNITED STATES OF AMERICA; LT.
KENNAR[1]; and, JAMES GIBBS, PA[2]    :
            *Defendants*.


## MEMORANDUM

**Jones, II  J.[3]**                                        **May 26, 2021**


### I.    Introduction

　　Plaintiff David Coleman commenced this action against Defendants alleging negligence

under the Federal Torts Claims Act,[4] and *Bivens*[5] violations on the bases of deliberate

indifference and excessive force under the Eighth Amendment. Plaintiff's claims arise from an

incident in which a vent grate fell on his head in the shower while he was serving a sentence at

FCI Fort Dix. Defendants move to dismiss Plaintiff's claims for lack of subject matter

jurisdiction. Alternatively, Defendants move for summary judgment on all of Plaintiff's claims.

---

[1] Although the caption of Plaintiff's Second Amended Complaint names Lt. Kennar as a
defendant (ECF No. 21), said Defendant identifies himself as "Lt. Kenner" in the instant Motion
to Dismiss/for Summary Judgment.  As such, for purposes of the instant discussion, the court
shall refer to this Defendant as Lt. Kenner.
[2] Although the caption of Plaintiff's Second Amended Complaint names James Gibbs as a
defendant (ECF No. 21), said Defendant identifies himself as "James Gibb" in the instant Motion
to Dismiss/for Summary Judgment.  As such, for purposes of the instant discussion, the court
shall refer to this Defendant as James Gibb.
[3] This matter was presided over by the Honorable Robert B. Kugler in the United States District
Court for the District of New Jersey until May 18, 2020, at which time the case was reassigned to
this Court for all further proceedings.  (ECF No. 104.)
[4] 28 U.S.C.S. § 2671, *et seq.*
[5] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971).

For the reasons set forth herein, Defendant USA's motion to dismiss shall be granted, as shall Defendants' motion for summary judgment on Plaintiff's deliberate indifference and excessive force claims.

## II.    Statement of Facts

Under the "Unit Rules" section of the FCI Fort Dix Admission and Orientation Inmate Handbook, "[s]howers are closed for cleaning from 7:30 a.m. until 10:30 a.m. and ***closed daily from 11:30 p.m. until 5:00 a.m.***"  (SUF ¶ 25; RSUF ¶ 25) (emphasis added). On the morning of January 21, 2013, between the hours of 1:00 a.m. and 3:00 a.m., Plaintiff, an inmate at FCI Fort Dix, was taking a shower when an object hit him on the head. (SUF ¶¶ 26, 45; RSUF ¶ 45; Defs.' Mot. Summ. J., Ex. B 102:4-10.) Plaintiff remembers being hit on the head and then being helped up by fellow inmate Tony Robinson. (SUF ¶¶ 28, 31; RSUF ¶¶ 28, 31.) Robinson, with the help of another unidentified inmate, brought Plaintiff to the Housing Unit Officer on duty, Officer Andrews. (SUF ¶¶ 33, 38; RSUF ¶¶ 33, 38.) Officer Andrews asked Plaintiff what happened and Plaintiff responded, "I don't know, something fell on my head in the shower." (SUF ¶ 34; RSUF ¶ 34.) Officer Andrews asked what fell on his head and Plaintiff said "it was a grate." (SUF ¶ 35; RSUF ¶ 35.) There is a vent located above the showerhead in the shower where Plaintiff's incident occurred. (SUF ¶ 37; RSUF ¶ 37.) When Officer Andrews saw Plaintiff after the incident, he observed a small cut on his head but did not view Plaintiff's injury as an emergency (SUF ¶¶ 49-50; RSUF ¶¶ 49-50.) Officer Andrews went to the shower area after Plaintiff's incident, where he observed a vent cover on the floor. (SUF ¶ 55; RSUF ¶ 55.) The vent's screws appeared to be tampered with, which Officer Andrews stated was the likely cause of its detachment. (Defs.' Mot. Summ. J., Ex. C at 53:16-25; RSUF ¶56.) Inmates notoriously used vents as hiding spots for contraband. (SUF ¶ 57; RSUF ¶ 57.)

After speaking with Officer Andrews about the incident, Plaintiff was transported from the housing unit to the Lieutenant's Office. (SUF ¶ 62; RSUF ¶ 62.) The Lieutenant on duty that morning was Defendant Kenner. (SUF ¶ 75; RSUF ¶ 75.) After Plaintiff arrived at the lieutenant's office at approximately 3:00 a.m., Defendant Kenner called the on-call staff physician, Nicoletta Turner-Foster, M.D., regarding Plaintiff's incident. (SUF ¶¶ 80-81; RSUF ¶¶ 80-81.) Dr. Foster spoke with Plaintiff over the phone to diagnose him and instructed him to go to Health Services for an evaluation during sick call. (SUF ¶¶ 82-83; RSUF ¶¶ 82-83.) Defendant Kenner decided to keep Plaintiff in the office for observation until two nurses in the Health Services Unit arrived to begin their shift at 6 a.m. (SUF ¶ 84; RSUF ¶ 84.)

At the Health Services Unit, Plaintiff was seen by Mid-Level Practitioner (MLP) Estella Richardson at 6:19 a.m., at which time Plaintiff reported symptoms of feeling dizzy and heaving throbbing head pain. (SUF ¶ 86; RSUF ¶ 86.) Plaintiff's exam showed a "minimal abrasion on parietal area." (SUF ¶ 87; RSUF ¶ 87.) MLP Richardson noted "superficial abrasion on scalp" and "poss. minor concussion on scalp" in the Health Problem Comment section of her report. (SUF ¶ 87; RSUF ¶ 87.)  In the Clinical Encounter note for Plaintiff's visit, Richardson recorded "abrasion on scalp was cleaned with betadine; no stitches required'" and she directed Plaintiff to follow up at Sick Call as needed and return to Sick Call if not improved. (SUF ¶ 88; RSUF ¶ 88.) Approximately one hour after Plaintiff had returned to his housing unit, the Health Services Unit received a call stating Plaintiff was complaining of blurry vision, neck pain and headache. (SUF ¶ 90; RSUF ¶ 90.) The medical staff decided to transfer Plaintiff to St. Francis Medical Center to rule-out an intercranial process. (SUF ¶ 92; RSUF ¶ 92.) On January 22, 2013, Plaintiff underwent a "CT Head/Brain w/o Contrast Exam" and a report was prepared including the following finding: "No CT evidence for acute intracranial hemorrhage or mass effect." (SUF ¶

93; RSUF ¶ 93.) Plaintiff also underwent a "CT Cervical Spine wo/ [sic] Contrast Exam" that same day and a report was prepared with the following finding: "There is an age indeterminate mild compression deformity of C6, predominantly involving the inferior endplate." (SUF ¶ 94; RSUF ¶ 94.) The next day, January 23, 2013, Plaintiff underwent an "MRI Cervical Spine w/o Contrast Exam" and a report was prepared with the following finding: "The MRI is technically slightly limited, but no evidence of abnormal signal is identified in the regional bone marrow with attention to C6, suggesting that the mild compression of C6 is developmental or relates to old trauma. The appearance of slight diminished statute of C6 is concordant with the recent CT." (SUF ¶ 95; RSUF ¶ 95.) The radiologist who performed the MRI further reported: "Mild compression deformity of the C6 vertebral body concordant with recent CT. This appears to be a chronic finding either reflecting old trauma or representing developmental variation. There is no evidence of acute traumatic injury. There is subluxation and the cord demonstrates normal morphology and signal characteristics." (SUF ¶ 96; RSUF ¶ 96.) Plaintiff was discharged from St. Francis Medical Center on January 25, 2013 with the following final diagnosis: "(1) Head trauma; (2) Compression fracture deformity of the C6 spine; (3) Headaches." (SUF ¶¶ 97-98; RSUF ¶¶ 97-98.)

On January 26, 2013, Defendant Gibb, an EMT-Paramedic in the Health Services Unit at FCI Fort Dix, received a radio call from the Housing Unit Officer that Plaintiff stated he could not move the right side of his body. (SUF ¶¶ 100, 103; RSUF ¶¶ 100, 103.) Defendant Gibb evaluated Plaintiff at Health Services where Plaintiff told Defendant Gibb that he was unable to move his right arm and right leg, and that he deserved a bottom bunk/first floor pass because of his neck. (SUF ¶¶ 104-105; RSUF ¶¶ 104-105.) Defendant Gibb recorded in his Clinical Encounter Note that he saw Plaintiff move his right hand to take Tylenol from a bag and tense

his right leg to put his boot on after the examination. (SUF ¶ 106; RSUF ¶ 106.) Dr. Chung, the on-call staff physician, gave Defendant Gibb the following verbal orders concerning Plaintiff: "(1) delete Decadron and begin 15 mg prednisone BID x 5 days; (2) allow bottom bunk for 30 days; no first-floor pass authorized because there were no clinical findings to allow a first-floor pass." (SUF ¶¶ 107-108; RSUF ¶¶ 107-108.)

On January 27, 2013, Defendant Gibb received another call about Plaintiff's inability to move the right side of his body and he went to examine Plaintiff in his housing unit. (SUF ¶¶ 110-111; RSUF ¶¶ 110-111.) During the examination, Defendant Gibb rubbed the lateral side of the sole of the right foot with a blunt instrument and observed Plaintiff's toes "curve down and inwards." (ECF No. 87-5 at 21.) Defendant Gibb contacted Dr. Chung, who gave Defendant Gibb verbal orders for no interventions or transport to the local hospital at that time. (SUF ¶¶ 113-114; RSUF ¶¶ 113-114.) Dr. Chung gave those same orders to the Operations Lieutenant. (SUF ¶ 115; RSUF ¶ 115.) During Defendant Gibb's evaluation, Correctional Officer José Reyes was securing Plaintiff's property to move him from his cell when he found a piece of metal fashioned into a weapon, sharpened to a point on one end, under Plaintiff's locker. (SUF ¶¶ 116-118; RSUF ¶¶ 116-118.) Officer Reyes wrote an Incident Report regarding his discovery of the piece of metal and gave it to the Operations Lieutenant, Corey Kaough. (SUF ¶¶ 121-123; RSUF ¶¶ 121-123.) Lieutenant Kaough determined that Plaintiff should be placed in the Special Housing Unit (SHU) for possession of a hazardous tool, pending an investigation by Special Investigative Services ("SIS"). (SUF ¶ 127; RSUF ¶ 127.) Dr. Chung authorized Plaintiff's move, at which time Defendant Gibb and a correctional officer transported Plaintiff from his housing unit to the Operations Lieutenant's Office to speak with Lieutenant Kaough. (SUF ¶¶ 129, 131; RSUF ¶¶ 129, 131.) Defendant Gibb and another officer then transported Plaintiff to a

cell in the SHU, during which time Defendant Gibb observed Plaintiff "lift[ing] his right arm up and away from his body several inches to facilitate upper strap placement." (SUF ¶ 132; ECF No. 87-5 at 21.) Later, Defendant Gibb received a call advising him that Plaintiff was yelling and demanding to be sent to the hospital. (SUF ¶ 133; RSUF ¶ 133.) Defendant Gibb discussed Plaintiff's demands with the on-call physician, who gave verbal orders for no interventions, no transport to the hospital, and for Plaintiff to be seen by the Health Services Unit in the morning. (SUF ¶¶ 134-135; RSUF ¶¶ 134-135.) The next morning, MLP José Ravago examined Plaintiff and recorded that "Patient cannot move his RIGHT foot or toes; patient refers decreased sensation on the lower extremity." (SUF ¶¶ 137-138; RSUF ¶¶ 137-138.) Based upon this determination, Plaintiff was sent to St. Francis Medical Center where he underwent the same exams as his previous visit and the findings were consistent. (SUF ¶¶ 140-143; RSUF ¶¶ 140-143.) On January 31, 2013, Plaintiff was discharged from St. Francis Medical Center with the following comments on his discharge summary:

> CBC including differential were essentially within normal limits. A comprehensive metabolic profile was normal. The patient had a CT scan of the head which did not show any acute injury. He also had an MRI of the cervical spine which was read as stable, mild loss of height of the C6 vertebral body. This is felt likely to either reflect old injury or be developmental. No findings to explain the right-sided motor deficit. This is the conclusion of the radiologist.

(SUF ¶¶ 144, 146; RSUF ¶¶ 144, 146.)

### III.    Standards of Review

#### a.    Subject Matter Jurisdiction

A challenge to subject matter jurisdiction under Rule 12(b)(1) may take two forms: a facial challenge or a factual challenge.  If a facial challenge concerns an alleged pleading deficiency, the trial court is restricted to a review of the allegations of the complaint and any documents referenced therein.  *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008); *Gould*

*Elec. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000). When considering a facial challenge, "the trial court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A factual challenge "concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *CNA*, 535 F.3d at 139 (internal quotation, citation, and alterations omitted). If the challenge before the trial court is a factual challenge, the court does not accord any presumption of truth to the allegations in the plaintiff's Complaint, and the plaintiff bears the burden of proving subject-matter jurisdiction. *Id.* With a factual challenge, the court may weigh evidence outside the pleadings and make factual findings related to the issue of jurisdiction. *Id.*; *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007). "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Mortensen*, 549 F.2d at 891.

**b. Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both: (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the

evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To that end, however, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)) (internal quotation marks omitted). Instead, an affiant must set forth specific facts that reveal a genuine issue of material fact. *Id*.

Finally, a court must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003). However, if a party fails to properly address another party's assertion of fact, a court may consider the fact undisputed and grant summary judgment. *See* Fed. R. Civ. P. 56(e)(2)-(3).

## IV.   Discussion

### A.  Subject Matter Jurisdiction

"The United States has sovereign immunity from civil liability, except when it consents to be sued." *McIntosh v. United States*, No. 19-2018, 2021 U.S. App. LEXIS 3085, at *7 (3d Cir. Feb. 4, 2021).  The Federal Torts Claims Act (FTCA) limits the United States' sovereign immunity by allowing "suits against the United States for torts committed by 'any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012) (quoting 22 U.S.C.§ 1346(b)(1)). However, the FTCA limits this liability by a discretionary function exception which provides that the Government cannot be sued for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Courts applying the discretionary function exception are guided by the two-part test established in *United States v. Gaubert*, 499 U.S. 315 (1991). First, the court must find that the act in question "involves an element of judgment or choice." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). There is no discretionary function if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). Second, if the challenged conduct is found to be discretionary in nature, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23.  "Stated another way, the discretionary function exception  bars government liability if the challenged

action 'involves the permissible exercise of policy judgment.'" *Castillo v. United States*, 166 F. App'x 587, 588-589 (3d Cir. 2006) (quoting *Berkovitz*, 486 U.S. at 537).

Plaintiff herein alleges the BOP's Federal Operations Manual (FOM) qualifies as a "policy" such that it precludes the application of the discretionary function exception. In particular, Plaintiff claims the FOM prescribes "specific requirements of ordinary diligence or reasonable care for maintaining and repairing shower vent grates through routine reporting, processing, executing, and documenting of Work Orders or Requests." (Pl.'s Opp'n Summ. J. 6.) This is not an accurate depiction of what the excerpt from the FOM—as provided by Plaintiff— actually says. In particular, the FOM makes no mention of any "specific requirements of ordinary diligence or reasonable care for maintaining and repairing shower vent grates[.]" (Pl.'s Opp'n Summ. J. Ex. I.) The fact that Fort Dix Facility Manager Ronald Brooks testified that he "understood that requests to replace missing shower-vents [sic] are categorized as minor work orders" under the FOM is irrelevant to the question at hand. (Pl.'s RSUF ¶ 39.)

Moreover, Plaintiff does not identify any "mandatory government[al] duty" which *specifically* prescribes a course of action for the BOP to follow with respect to the vents. *See Ryan v. United States*, 233 F. Supp. 2d 668, 682 (D. N.J. 2002) (finding the government had mandatory duties to conduct daily and weekly inspections as specified by contract provisions); *see also, S.R.P. ex rel Abunabba v. United States*, 676 F.3d 329, 335 (3d Cir. 2012) (finding National Park Service "[p]olicies do not specifically dictate the way in which park officials should balance these [preservation of a park's scenery and natural resources with public safety] concerns or the specific actions that must be taken in response to particular problems.").

In *Merando v. United States*, 517 F.3d 160, 163 (3d Cir. 2008), Plaintiff alleged the Park Service was negligent in not finding and managing a dead tree that fell on Plaintiff's car as he

was passing under the tree. Plaintiff argued the Park Service did not have discretion regarding how it managed hazardous trees because it had a hazardous tree management plan. *Id.* at 168. The court noted that the relevant inquiry was whether any federal statute, regulation or administrative policy mandated the Park Service to "locate and manage hazardous tree in *any specific manner.*" *Id.* (emphasis added) The court ultimately held that the pertinent statutes and policies did not mandate "how the Government should locate or deal with hazardous trees" nor did the Natural Resources Management Guidelines mandate "any particular methods of hazardous tree identification or removal." *Id.* at 167-70. Further, the court highlighted that nothing required "park employees to inspect certain trees on certain days or remove a particular number of trees per week." *Id.* at 172. Accordingly, the method by which the Park Service carried out such tree inspections fell within the discretionary function exception to the government's tort liability. *Id.*

In this case, there exists no federal statute, regulation or policy mandating specific action by the BOP with regard to the inspection and maintenance of air vents. Instead, these tasks fall within the discretion of prison officials who must weigh the necessity and frequency of said inspections and maintenance against the limited resources available to them and the need to maintain safety and order within the prison. As such, this Court finds vent inspections and maintenance constitute discretionary conduct.

When discretionary conduct is found, the next prong requires the court to determine if that conduct "is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. The purpose of the discretionary function exception "is to 'prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* at 323 (quoting

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). Thus, the exception "'protects only governmental actions and decisions based on considerations of public policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. 531, 537 (1988)).

"While federal law requires the Bureau of Prisons to 'provide for the safekeeping, care, and subsistence' of all persons within its custody, 18 U.S.C. § 4042(a)(2), the statute leaves the implementation of these duties to BOP officials' discretion." *Acosta v. Schultz,* Civil Action No. 12-6614, 2014 U.S. Dist. LEXIS 28531, at *27-28 (D. N.J. March 6, 2014). Inasmuch as the inspection of more than 3,000 vents throughout FCI Fort Dix housing units and at least 5,000 more in non-housing units[6]—when weighed against the prison's duty of "safekeeping, care, and subsistence" of the inmates with limited staff and the fact that there had never been a reported incident of injury from a falling vent in the past—mandates this Court to conclude the discretionary function exception does apply. Accordingly, the government's motion to dismiss for lack of subject matter jurisdiction shall be granted.

### B.  Motion for Summary Judgment Regarding Defendants Kenner and Gibb

#### 1.  *Bivens*

42 U.S.C. § 1983 provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected" any person to the deprivation of any right protected by federal law or the United States Constitution. *Brown v. Philip Morris Inc.,* 250 F.3d 780, 800 (3d Cir. 2001). Under § 1983, an injured individual is entitled to "money damages if a state official violates his or her constitutional right." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854

---

[6] (SUF ¶¶ 9-10.)

(2017). For federal officials, "[i]t is well established that liability under § 1983 will not attach for actions taken under color of federal law." *Brown*, 250 F.3d at 800.

While § 1983 protects against violations of constitutional rights at the hands of state officials, the Supreme Court has recognized, *in limited situations*, a private cause of action against federal officials. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971). "A *Bivens* action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." *Brown*, 250 F.3d at 800. *See also Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018) (stating "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations."). "In order to state a claim under *Bivens*, a claimant must show: (1) a deprivation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation of the right was caused by an official acting under color of federal law." *Doty v. United States*, Civ. No. 15-3016, 2016 U.S. Dist. LEXIS 77650, at *16 (D. N.J. June 15, 2016).

With respect to scope, *Bivens* permitted a damages remedy "to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures." *Ziglar*, 137 S. Ct. at 1854. The Supreme Court has extended *Bivens* to only two other constitutional violations. *Id.* In *Davis v. Passman*, 442 U.S. 228 (1979), the Court held that the Fifth Amendment Due Process Clause gave an administrative assistant a damages remedy against a Congressman for firing her due to gender. *Ziglar*, 137 S. Ct. at 1854. In *Carlson v. Green*, 446 U.S. 14 (1980), the Court held the Eighth Amendment Cruel and Unusual Punishment Clause gave a prisoner's estate a damages remedy against prison officials for failing to provide adequate medical treatment for asthma. *Ziglar*, 137 S. Ct. at 1854. *Bivens*, *Davis*, and

*Carlson* are the only cases in which "the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 137 S. Ct. at 1857. *See also Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) (same); *Black v. United States*, 436 F. Supp. 3d 813, 815 (D.N.J. 2020) (same). Courts are cautioned that the extension of *Bivens* to matters involving constitutional claims other than those already recognized is "a 'disfavored judicial activity.'" *Mammana v. Barben*, No. 20-2364, 2021 U.S. App. LEXIS 15191, at *4 (3d Cir. May 21, 2021) (quoting *Ziglar*, 137 S. Ct. at 1857).

### a. Deliberate Indifference

Plaintiff herein seeks damages on the basis of deliberate indifference for Defendants Kenner and Gibb's alleged failure to adequately address his medical needs after the shower incident. It is well settled that a prison official's deliberate indifference to a prisoner's serious medical needs is a violation of the prisoner's Eighth Amendment protection against cruel and unusual punishment. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). In this regard,

> "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (citations omitted). Allegations of mere negligent treatment, including medical malpractice, do not trigger the protections of the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06. Furthermore, a prisoner's medical treatment is presumed to be proper "absent evidence that it violates professional standards of care." *Pearson v. Prison Health Serv*., 850 F.3d 526, 535 (3d Cir. 2017) (citation omitted). A prisoner's disagreement with the course of treatment does not create an actionable constitutional violation. *See Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

*Tolentino v. Smucker*, No. 20-3209, 2021 U.S. App. LEXIS 9848, at *2-3 (3d Cir. April 6, 2021).

As referenced above, an inmate who brings a deliberate indifference claim "must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A medical

need is considered serious "if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Monmouth County Correctional Institutional Inmates*, 834 F.2d at 347 (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D. N.J. 1979)).

Deliberate indifference further "requires the official to both 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and to 'also draw the inference.'" *Chavarriaga v. New Jersey Dept. of Corrections*, 806 F.3d 210, 229 (3d Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1997)).

Ultimately, "deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Id.*

### i. Defendant Kenner

Defendant Kenner is a non-medical prison official. Accordingly, he "cannot 'be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference' when the 'prisoner is under the care of medical experts' and the official does not have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Pearson v. Prison Health Service*, 580 F.3d 526, 543 (quoting *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (holding that non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.").

It is undisputed that upon Plaintiff's arrival at Defendant Kenner's office, Kenner called the on-call physician and had the physician speak with Plaintiff. (SUF ¶¶ 80-81; RSUF ¶¶ 80-81.) Plaintiff was instructed to return at sick call and Defendant Kenner chose to keep Plaintiff

in the office for observation until then, instead of sending him back to his cell. (SUF ¶¶ 82-84; RSUF ¶¶ 82-84.) Plaintiff fails show that Defendant Kenner acted with deliberate indifference. Plaintiff alleges he was intentionally denied and delayed medical care by Defendant Kenner but does not point to any facts of record in support of his claim. On the contrary, the facts show that Defendant Kenner promptly called the on-call physician, and once under her care, abided by her instructions. (SUF ¶¶ 80-84; RSUF ¶¶ 80-84.) Because Plaintiff cannot establish the first prong of a deliberate indifference claim, the second prong is rendered moot.

Accordingly, Plaintiff has failed to raise any genuine dispute of material fact as to Defendant Kenner's actions, and Defendant Kenner is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### ii.    Defendant Gibb

With respect to Defendant Gibb, Plaintiff broadly alleges said Defendant intentionally denied and delayed medical attention but does not point to any dispute of material fact in support of his claim. It is undisputed that Defendant Gibb evaluated Plaintiff once at Health Services and once in his housing unit. (SUF ¶¶ 104-105, 110-111; RSUF ¶¶ 104-105, 110-111.) After conducting each evaluation, Gibb consulted with the on-staff physician and took orders from him concerning any further treatment. (SUF ¶¶ 107, 113; RSUF ¶¶ 107, 113.) Neither one of these actions rise to the level of deliberate indifference protected by the Eighth Amendment. Moreover, Plaintiff's claim that Defendant Gibb intentionally denied access to medical prescriptions and prescribed physical therapy, is factually unsupported by the record. A Clinical Encounter record dated January 26, 2013 states in pertinent part that Defendant Gibb "presented and discussed [Plaintiff's medical case] in great length with on call MD." (ECF No. 87-3 at 34.) Pursuant to that discussion, Defendant Gibb . . .

[R]eceived verbal orders with good verbal read back for:
- Delete decadron begin 15 mg prednisone BID x 5 days. (Removed from pxsys)
- Allow bottom bunk x 30 days. "No first floor pass authorized." Inmate was able to ambulate up to and down from second floor yesterday and today. There is [sic] no clinical findings to allow first floor pass. This was verbally confirmed twice with MD.

Inmate was instructed on the MDs [sic] orders, inmate verbalized his disapproval colorfully, was discharged back to housing unit.

(ECF No. 87-3 at 34.)

In accordance with the doctor's orders, Defendant Gibb prescribed prednisone for Plaintiff by "[s]elf [a]dministration. (ECF No. 87-3 at 34.) This, coupled with Plaintiff's claim that Defendant Gibb prevented him from going to physical therapy and the hospital,[7] cannot be attributed to Gibb, as both constitute a disagreement regarding prison doctors' decisions. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017) ("a *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others."); *see also Monmouth County Correctional Institutional Inmates*, 834 F.2d at 346 (disagreements to the method of care are insufficient to support a deliberate indifference claim).

Accordingly, for the aforementioned reasons, Defendant Gibb is entitled to summary judgment on this claim.

---

[7] As the result of Defendant Gibb's second encounter with Plaintiff, a Clinical Evaluation record dated January 27, 2013 states in pertinent part that Defendant Gibb made "phone contact [ ] with on call MD, case was presented and discussed in detail, discharge summary was reviewed with emphasis on 'There is no evidence of any neurological deficit.' MD was placed into contact with east RN who evaluated inmate Coleman 2 days prior, after being discharged from hospital, to discuss her encounter with inmate Coleman. Per on call physician, I received verbal orders with good verbal read back (confirmed twice) for no interventions, nor transport to local hospital at this time. Md [sic] was placed in contact with operations LT, where the LT received / confirmed the same orders." (ECF No. 87-3 at 38.)

### b. Excessive Force

Last, Plaintiff claims he was the victim of excessive force by Defendant Gibb. An inmate's challenge to a prison official's use of excessive force is brought under the Eighth Amendment's protection against cruel and unusual punishment. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). When assessing an excessive force claim, the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. To that end,

> [C]ourts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Brooks v. Kyler,* 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

Moreover, "'[t]he infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.'" *Jenkins v. Hayman*, Civil Action No. 09-4989, 2013 U.S. Dist. LEXIS 88446, at *25 (D. N.J. June 24, 2013) (quoting *Whitley*, 475 U.S. at 319).

When evaluating the nature of the force used, the absence of injury is relevant but not determinative. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."). Notably, "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A *de minimis* use of force that "is not of a sort 'repugnant to the conscience of mankind'" does not violate the cruel and unusual punishment clause of the Eighth

Amendment. *Id.* at 9-10 (quoting *Whitley*, 475 U.S. at 327). "In other words, physical force amounting to an actionable tort claim may not be enough to qualify as a claim under the Eighth Amendment." *Johns v. Nunn*, Civil No. 04-0624, 2005 U.S. Dist. LEXIS 28906, at *19 (D. N.J. Nov. 17, 2005) (quoting *Williams v. Mussomelli*, 722 F.2d 1130, 1133 (3d Cir. 1983)).

The alleged force at issue in this case concerns the moment when Defendant Gibb transferred Plaintiff from a stretcher to a mat on the floor of his cell in the SHU. Plaintiff alleges Defendant Gibb used excessive force when he "threw him onto a mat on the floor." (RSUF ¶ 132). However, during his deposition, Plaintiff could not remember if another corrections officer assisted Defendant Gibb in transporting him to the SHU. (ECF No. 97-3 at 15.) Nor could Plaintiff remember if he was in a wheelchair or on a stretcher at the time but was certain it was "one or the other." (ECF No. 97-3 at 14.) Plaintiff also could not remember how far he was "thrown" or whether he landed face down or on his back. (ECF No. 97-3 at 14.) Plaintiff testified that "all I remember is being thrown to [sic] the SHU. Like I said, I don't remember." (ECF No. 97-3 at 16.) Moreover, Plaintiff does not allege any injury that resulted from the purported incident of being "thrown" on the mat. (Second Am. Compl. ¶¶ 35-36.) Instead, he alleges in conclusory fashion that Gibb "left Coleman on the mat covered in urine, in pain, and unable to move[,]" and references the results of testing pertaining to the shower incident injury to support his excessive force claim. (Second Am. Compl. ¶ 37; RSUF ¶ 132.[8])

Defendant Gibb testified that he and another corrections officer transported Plaintiff to the SHU on a stretcher. (ECF No. 87-5 at 15.) Upon arrival at the SHU, Gibb "Put the stretcher into one of the showers to protect [Plaintiff's] dignity. Followed SHU protocol to strip him out

[8] This Court notes that Plaintiff's submissions do not contain page 153 of Plaintiff's deposition, which is cited in Paragraph 132 of his RSUF as proof of these facts. Moreover, the other cited page—155—does not contain facts consistent with Plaintiff's representation of same.

and to place him into SHU clothing. And then placed [Plaintiff] onto a mattress on the floor in a

cell." (ECF No. 87-5 at 15.) Gibb stated he has "never thrown a patient in [his] life." (ECF No.

87-5 at 15.) Gibb further testified another officer assisted him in transporting Plaintiff to the

mattress in the SHU cell because "[he] can't move a long board or person by [himself]." (ECF

No. 87-5 at 15.)

Other than Plaintiff's vague account of the alleged incident during depositions, he

provides no evidence of record to establish Defendant Gibb acted maliciously or sadistically with

the intent to cause harm to Plaintiff.[9] Instead, the record demonstrates that Defendant Gibb

responded to Plaintiff's demands to go to the hospital shortly after being placed in the SHU.

(ECF No. 87-5 at 21.) Specifically, Gibb called the on-call doctor, John Chung, M.D., and

presented Plaintiff's case "in detail." (ECF No. 87-5 at 21.) Defendant Gibb "received verbal

---

[9] In support of his claims, Plaintiff retained the services of Dr. James G. Lowe to examine
Plaintiff and assess the medical records pertaining to Plaintiff's medical treatment while
incarcerated. Dr. Lowe prepared a report on September 19, 2018, in which he begins his analysis
in the context of the vent incident which occurred when Plaintiff was taking a shower on January
21, 2013. (ECF No. 97-8 at 2.) Dr. Lowe references Dr. Chung's discharge of Plaintiff "back to
housing" on January 26, 2013. (ECF No. 97-8 at 2.) Dr. Lowe next references Plaintiff's
complaints on January 27, 2013, in which he claimed "he could not move his right side and was
told that was to be evaluated the next day[.]" (ECF No. 97-8 at 2.) Last, Dr. Lowe references the
medical evaluation of Plaintiff that occurred in the SHU on January 28, 2013 and resulted in
Plaintiff being transported to the hospital. (ECF No. 97-8 at 2.) No mention is made of any
incident that purportedly occurred upon Plaintiff's transport to the SHU on January 27, 2013.
Dr. Lowe notes the neurologist who evaluated Plaintiff at the hospital on January 28, 2013 "felt
there was no change in the cervical CT scan and that the right sided weakness could not be
'objectively proven.'" (ECF No. 97-8 at 2.) Dr. Lowe's own analysis of the CT scan of cervical
spine taken on January 28, 2013 revealed no change from the CT scan of the cervical scan taken
on January 22, 2013. (ECF No. 97-8 at 5.) Moreover, the "MRI of the cervical spine from
1/30/13 shows similar findings" as that of the January 22, 2013 and January 28, 2013 CT scans.
(ECF No. 97-8 at 5.) Dr. Lowe concludes that the January 21, 2013 shower incident was the
cause of Plaintiff's "head injury, subsequent post-traumatic seizure, right hemiparesis, and a C6
vertebral fracture with possible vertebral artery injury." (ECF No. 97-8 at 5.) As such,
Plaintiff's reliance on Dr. Lowe's report in support of his representation to the court that "it is
undisputed that Mr. Coleman suffered serious exacerbation of injuries that required his transport
to an outside hospital for medical treatment following these events" is not born out by the record.

orders with good verbal read back (confirmed twice) for no interventions at this time, no transport to hospital, inmate is to be evaluated by HSU [sic] staff in the morning. Those orders were relayed to OPS LT." (ECF No. 87-5 at 21.) When evaluated in the SHU by José Ravago, MLP the following morning, Plaintiff complained of "sudden right sided weakness which was first experienced when he woke up yesterday morning." (ECF No. 87-3 at 41.) Based upon Plaintiff's complaint and his history of head and neck injury from the shower incident, a determination was made to transport Plaintiff to the hospital. (ECF No. 87-3 at 41.) Upon admission to the hospital, Plaintiff complained of the same right-sided weakness and paralysis he complained of ***prior to his transfer to the SHU***. (ECF No. 87-3 at 53.) All diagnostic testing performed at the hospital confirmed the findings from Plaintiff's prior hospital visits and diagnostic testing. (ECF No. 87-3 at 46-51.)

The record before this court is devoid of any mention by Plaintiff to any prison staff or medical provider prior to commencement of litigation, that he was "thrown on the mat" by Gibb on January 27, 2013. As discussed above, "a nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Applying this standard to Plaintiff's excessive force claim, this Court concludes Plaintiff has failed to satisfy his burden as the non-moving party at the summary judgment stage.

In view of the foregoing, Defendants' motion for summary judgment on the excessive force claim against Defendant Gibb shall be granted.

**V.      Conclusion**

For the reasons set forth hereinabove, Defendants' Motion shall be granted in its entirety.

An appropriate Order follows.

BY THE COURT:


/s/ Hon. C. Darnell Jones II
_____
C. Darnell Jones, II      J.